# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM J SANDS,

                Plaintiff,

    v.

KAMBOURIS CONSTRUCTION, et al.,

                Defendants.

CIVIL ACTION NO. 3:18-CV-02426

(MEHALCHICK, M.J.)

## MEMORANDUM

Plaintiff William J. Sands ("Sands" or "Plaintiff") initiated this action on November 2, 2018, in the Court of Common Pleas of Carbon County. (Doc. 1-1, at 5). In his complaint, Sands alleges that Defendants Kambouris Construction and Hristos Kambouris ("Kambouris" or "Defendants") breached a construction contract between the parties when Kambouris failed to adhere to the agreed upon terms of the contract. (Doc. 1-1, at 8-11). Kambouris filed a notice of removal on December 21, 2018, removing the case to the United States District Court for the Middle District of Pennsylvania. (Doc. 1). Defendants filed their answer, affirmative defenses, and counterclaim against Sands on January 27, 2018. (Doc. 2). Kambouris contends that Sands breached a construction contract between the parties when he failed to tender the total amount of compensation to Kambouris. (Doc. 2, at 20). Sands filed an answer to Kambouris's counterclaim on January 20, 2019. (Doc. 5). The parties consented to proceed before a United States Magistrate Judge on February 14, 2019. (Doc. 11).

A non-jury trial was conducted before Chief Magistrate Judge Karoline Mehalchick on April 12, 2021, and April 20, 2021. (Doc. 40); (Doc. 43). Both parties were represented by

counsel at trial, and both parties filed proposed findings of fact and conclusion of law following trial. (Doc. 48); (Doc. 49). Based on these submissions, the Court has distilled four issues requiring resolution; namely: (1) whether Kambouris or Sands breached the contract created between the two parties; (2) whether Kambouris or Sands were subjected to unjust enrichment; (3) whether Kambouris violated the Pennsylvania Home Improvement Consumer Protection Act, 73 P.S. 517.1 ("HICPA"); and (4) whether Sands is entitled to recovery under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-1 ("UTPCPL").

The Court, having heard the testimony and reviewed all documentary evidence, now enters the following Findings of Fact, Conclusions of Law, and Decision pursuant to Rule 52 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 52.

## FINDINGS OF FACT

The following findings of fact are based upon the stipulations of the parties, as well as the testimony and evidence that the Court found credible as presented at trial.

1. The Plaintiff and Counterclaim - Defendant is William J. Sands, a resident of Plantation, Florida. Sands also owns a home in Albrightsville, Pennsylvania (the "Property"). (Doc. 2, at 1, 18; Doc. 45, at 4, Tr. of Trial, 4:11-15, April 12, 2021).

2. The Defendants and Counterclaim – Plaintiffs are Hristos Kambouris and Kambouris Construction. (Doc. 2, at 1, 18).

3. Hristos Kambouris is a general contractor licensed in Pennsylvania who trades and does business under the name Kambouris Construction. (Doc. 45, at 5, 100, Tr. of Trial, 5:8-14, 100:11-12, April 12, 2021).

4. Sands bought the Property with the intent to perform renovations. (Doc. 45, at 5, Tr. of Trial, 5:3-5, April 12, 2021).

5. Sands's brother, Tom ("Tom"), introduced Sands and Kambouris with the intent that Kambouris could perform construction work on the Property. (Doc. 45, at 5, Tr. of Trial, 5:15-20, April 12, 2021).

6. The two spoke in person around Thanksgiving of 2017 about the work Sands wanted done on the Property. (Doc. 45, at 5-6, 103, Tr. of Trial, 5-6:21-8, 103:16-23, April 12, 2021).

7. Kambouris did not take notes during his first conversation with Sands. (Doc. 45, at 202, Tr. of Trial, 202:1-4, April 12, 2021).

8. Sands hired Kambouris to perform work at the Property. (Doc. 45, at 5, Tr. of Trial, 5:6-11, April 12, 2021).

9. Kambouris started the project in January 2018 without a written contract because of his positive relationship with Tom. (Doc. 45, at 10, 113, Tr. of Trial, 10:19-23, 113:7-17, April 12, 2021).

10. The project originally was going to cost $60,000.00 and was intended to be completed before Sands's mother's birthday party which was in July 2018. (Doc. 45, at 8, 104-05, Tr. of Trial, 8:1-10, 104:21-25, 105:1, April 12, 2021).

11. In the initial meeting, the two discussed the addition of a bathroom and a closet in the master bedroom, renovations to the kitchen cabinets, an addition, and some electrical work. (Doc. 45, at 6, 104, Tr. of Trial, 6:11-15, 104:14-17, April 12, 2021).

12. On December 26, 2017, Kambouris, Sands, and Tom met to discuss expanding the scope of the project including the addition of hardwood flooring. (Doc. 45, at 106, Tr. of Trial, 106:10-16, April 12, 2021).

13. Kambouris informed Sands that the project would now cost $100,000.00 and would be difficult to complete by the original agreed upon date. (Doc. 45, at 107-08, Tr. of Trial, 107:17-25, 108:1-8, April 12, 2021).

14. Kambouris began work on the project in January 2018 and was given $5,000.00 in cash by Tom to begin work. (Doc. 45, at 10, 108, 111 Tr. of Trial, 10:21-23, 108:9-11, 111:12-14, April 12, 2021).

15. Tom monitored the progress throughout the project because he lived in Pennsylvania and Sands did not. (Doc. 45, at 109, Tr. of Trial, 109:6-8, April 12, 2021).

16. Upon starting the project, Kambouris discovered issues throughout the home, complicating the renovation and delaying the projected completion date. (Doc. 45, at 112, 114, 116-117, Tr. of Trial, 112:1-24, 114:12-19, 116:24-25, 117:1-17, April 12, 2021).

17. Kambouris discovered rot throughout the house. (Doc. 45, at 112, Tr. of Trial, 112:1-24, April 12, 2021; Defendants Ex. 7-9).

18. Kambouris discovered that the tile in the master bedroom had been installed incorrectly and was difficult to remove. (Doc. 45, at 114, Tr. of Trial, 114: 12-19, April 12, 2021; Defendants Ex. 4-6).

19. Kambouris discovered that there was a variance in the levels of the floors in the bedroom and the rest of the house, which required additional work to level the

flooring. (Doc. 45, at 116-117, Tr. of Trial, 116:24-25, 117:1-17, April 12, 2021; Defendants Ex. 10).

20. Sands requested that Kambouris prioritize certain projects, however Kambouris explained to Sands that he was unable to do so. (Doc. 45, at 97-98, Tr. of Trial, 97:18-25, 98:1-13, April 12, 2021).

21. Kambouris only communicated with Sands through phone calls, whereas Kambouris communicated and updated Tom through text message. (Doc. 45, at 12, 109, Tr. of Trial, 12:5-7, 109:1-11, April 12, 2021; Defendants Ex. 16, 77, 79-80, 83-84B).

22. Sands visited the property three times over the course of Kambouris's work on the project. (Doc. 46, at 38, Tr. of Trial, 38:7-8, April 20, 2021).

23. Kambouris believed that Tom, who was frequently at the property, was communicating the progress to Sands. (Doc. 45, at 109, Tr. of Trial, 109:12-14, April 12, 2021; Doc. 46, at 43, 44, Tr. of Trial, 43:14-25, 44:1-4, April 20, 2021).

24. Kambouris sent photos, videos, and updates to Tom regarding the renovations. (Defenses Ex. 16; 77; 79).

25. Kambouris did not provide Sands with copies of invoices for all purchases for his work on the Property. (Doc. 46, at 42, Tr. of Trial, 42:8-25, April 20, 2021).

26. The project expanded to include construction on the roof, the deck, enlarging the kitchen to accommodate the cabinets, and a laundry room. (Doc. 45, at 109, Tr. of Trial, 109:15-25, April 12, 2021).

27. Kambouris advised Sands that the project would cost more than $100,000.00 and that the deadline would be difficult to meet due to the expanding scope of the project. (Doc. 45, at 110, 112, Tr. of Trial, 110:9-25, 112:8-11, April 12, 2021).

28. The first contract was reduced to writing in March 2018 and was given to Sands in

    Florida. (Doc. 45, at 15, Tr. of Trial, 15:1-5, April 12, 2021).

29. The March 2018 contract included the following items and costs:

| | | |
|---|---|---|
| a. | 5-ton air conditioning and heating unit, as well as duct work | $16,000.00 |
| b. | Windows for the master bedroom and bathroom | $4,200.00 |
| c. | Plywood and wooden beams (2x10s, 2x6s, 2x4s) | $5,300.00 |
| d. | Electrical panel, high hats, exhaust fans, wire boxes, and labor for rough-in electrical work | $4,400.00 |
| e. | Rough-in plumbing in the kitchen, bathrooms, and laundry room | $3,400.00 |
| f. | Insulation | $1,800.00 |
| g. | Sheetrock installation and materials | $4,800.00 |
| h. | Hardwood flooring materials | $11,843.66 |
| i. | Labor for hardwood flooring | $10,000.00 |
| j. | Dumpsters, 3 so far | $2,000.00 |
| k. | Surveyor | $900.00 |
| l. | Architectural prints for bedroom and addition | $2,100.00 |
| m. | Labor | $16,000.00 |
| n. | Installation of kitchen and laundry room vanities | $1,300.00 |
| o. | Tile for the primary bath and laundry room | $4,500.00 |

6

|     |                              |             |
|-----|------------------------------|-------------|
| p.  | Shower doors                 | $1,400.00   |
| q.  | Side door for master bedroom | $600.00     |
| r.  | A deck, 50x20, treated only  | $20,000.00  |
| s.  | Roof repair for the old roof | $11,500.00  |
| t.  | Addition                     | $40,000.00  |

(Plaintiff Ex. 19; Defendants Ex. 33).

30. The March 2018 contract totaled $162,043.00 and noted that kitchen cabinets and granite would be installed but the cost of materials were not yet included in the proposal.[1] (Plaintiff Ex. 19; Defendants Ex. 33).

31. The March 2018contract also noted that toilets, faucets, shower fixtures, and a hot water heater would still need to be purchased. (Plaintiff Ex. 19; Defendants Ex. 33).

32. After reviewing the proposal, Sands called Kambouris and told him to stop all work. (Doc. 45, at 21, Tr. of Trial, 21:6-11, April 12, 2021).

33. Kambouris explained that now that he was into the job, he knew what it would take to finish the tasks on the March 2018 contract. (Doc. 45, at 21, Tr. of Trial, 21:21-23, April 12, 2021).

34. Sands did not sign the March contract but tendered additional payment to Kambouris. (Doc. 45, at 26, Tr. of Trial, 26:6-10, April 12, 2021; Plaintiff Ex. 19, 76; Defendants Ex. 33).

---

[1] The Court's computation of the total amount under the contract includes an additional 66 cents. However, both parties omit the additional 66 cents from their findings of fact and conclusions of law and their complaint and counter claim. (Doc. 1-1; Doc. 2; Doc. 48; Doc. 49). Thus, the Court will omit the 66 cents from the final computation of damages.

35. Around May 2018, Kambouris prepared an updated contract that included the same terms as the March 2018 contract with additional costs and extras that were discussed, previously. (Plaintiff Ex. 1; Defendants Ex. 81).

36. The "extras" included toilets, faucets, shower fixtures, a hot water heater, vanity tops, faucets, sinks, shower valves, light outlets, switches, trim, doors, shower doors, paint inside, and spot paint outside totaling an additional $15,957.00. (Plaintiff Ex. 1; Defendants Ex. 81).

37. Additionally, the May 2018 contract noted an estimate of $13,150.00 for kitchen cabinets; no price was indicated for the granite. (Plaintiff Ex. 1; Defendants Ex. 81).

38. Kambouris did not provide any change orders to Sands. (Doc. 45, at 26, 33, 203, 204 Tr. of Trial, 26:5-7, 33:7-10, 203:14-17, 21-25, 204:1-7, April 12, 2021).

39. Kambouris indicated that he did not need to provide Sands with a change order because Sands had not signed the previous contract from March 2018 so there was no acting contract to change. (Doc. 45, at 202-03, Tr. of Trial, 202:5-13, 24-5, 203:1-12, April 12, 2021).

40. The May 2018 contract totaled $178,000.00, not including the kitchen cabinets. (Plaintiff Ex. 1; Defendants Ex. 81).

41. Sands signed the May 2018 contract. (Doc. 45, at 27-28, Tr. of Trial, 27:21-25, 28:1, April 12, 2021; Plaintiff Ex. 1; Defendants Ex. 81).

42. Sands paid Kambouris $172,000.00 out of the $178,000.00. (Doc. 45, at 33, Tr. of Trial, 33:22-25, April 12, 2021).

43. Throughout the course of the project, Sands made changes and requested that additional tasks be performed. (Doc. 45, at 145, Tr. of Trial, 145:2-11, April 12, 2021).

8

44. The additional tasks and services that Kambouris provided included the purchase and installation of two (2) additional windows in the kitchen and laundry room, painting and electrical work in the loft/attic area, materials for and construction of a utility closet in the garage; materials and installation of tile in an additional bathroom, purchase and installation of two (2) exterior sliding doors. The total value for the tasks and services performed was $24,800.00. (Doc. 45, at 156-161, Tr. of Trial, 156:2-25, 157:1-25, 158:1-25, 159:1-25, 160:1-25, 161:1-17, April 12, 2021; Doc. 46, at 16-21, Tr. of Trial, 16:5-21, 17:9-22, 18:9-19, 25, 19:1-25, 20:1-12, 21:16-25, April 20, 2021).

45. Kambouris's work was in compliance with permit and inspection requirements and passed all inspections. (Doc. 45, at 127, Tr. of Trial, 127:1-17, April 12, 2021).

46. Sands was displeased with Kambouris's work as Kambouris had failed to meet the deadline and the cost of the project had significantly increased. (Doc. 45, at 113, Tr. of Trial 113:16-17, April 12, 2021).

47. The circumstances surrounding the project led to a dispute between the parties. (Doc. 45, at 167, Tr. of Trial 167:21-24, April 12, 2021).

48. Kambouris told Sands that he would need the total amount from the May 2018 contract and money to compensate for the additional tasks Sands had requested to finish the construction job or he would leave the project. Kambouris wanted Sands to conclude that there was an outstanding balance owed to Kambouris for the project. (Doc. 45, at 25, 167, 168, Tr. of Trial, 25:21-25, 167:22-24, 168:2-5, April 12, 2021).

49. Kambouris did not finish all of the action items that were included on the May 2018 contract and left the project in late June. (Doc. 45, at 33, 167, Tr. of Trial, 33:15-17, 167:15-18, April 12, 2021).

9

50. Kambouris and Tom engaged in discussions in an attempt to resolve the discrepancies in the payment that was owed to Kambouris. (Doc. 45, at 170, Tr. of Trial 170:11-14, April 12, 2021; Defendants Ex. 84B).

51. Kambouris was willing to return to the project and agree to the resolution, but eventually left the project. (Doc. 45, 170-71, Tr. of Trial, 170:18-25, 171:1, April 12, 2021).

52. At the time Kambouris left the project the incomplete work consisted of the back of the bar counters, outlets, grout, painting of the outside of the house, interior locks, and the shower doors. (Doc. 45, 171-73, Tr. of Trial, 171:5-12, 172:7-15, 173:1-17, April 12, 2021).

53. Kambouris estimated that the cost of work that had not been completed was around $4,500.00 to $5,000.00. (Doc. 45, 218-19, Tr. of Trial, 218:23-25, 219:1-3, April 12, 2021).

54. Sands completed the work after Kambouris had left the project and submitted invoices as to the amount of work done totaling $65,237.64. Those invoices included the following:

   a. Kohl Building Products       $1,063.37

   b. Prestige Marble & Granite     $11,354.00

   c. Feather River Door         $3,502.35

   d. Leon Clapper              $6,192.56

   e. Clear Choice Glass and Mirror   $2,273.00

    f.   Pine Ridge Services                   $5,000.00

    g.   Salmon Electric                       $700.00

    h.   Ruth Painting                        $5,400.00

    i.   Home Depot                         $657.37

    j.   Calcano Plumbing                 $6,500.00

    k.   The Flying Locksmiths          $1,643.00

    l.   The Flying Locksmiths          $550.99

    m. Pro Care                           $475.00

    n.   Burke Construction            $19,926.00

(Plaintiff Ex. 5-18).

55. The invoices from Calcano Plumbing and Salmon Electric were to perform finishing work not encompassed by the May 2018 contract. (Plaintiff Ex. 11, 14, 1; Defendants Ex. 81).

56. When Kambouris left the project, the final plumbing items had not been selected and could not be included in the total for the May 2018 contract. The only plumbing that was accounted for in the May 2018 contract was "rough-in plumbing" which includes installation of the pipes and drains and does not include actual toilets, faucets, etc. (Doc. 45, at 173, 184, Tr. of Trial, 173:5-17, 184:9-16, April 12, 2021).

57. Kambouris did not damage the gravel driveway during his work on the Property. (Doc. 45, at 83, 179, Tr. of Trial, 83:4-14, 179:21-25, April 12, 2021).

58. The May 2018 contract did not include a driveway or landscaping. (Plaintiff Ex. 1; Defendants Ex. 81).

59. Kambouris properly graded the soil and rock for the addition and properly installed a drain system for the addition all of which passed upon inspection. (Doc. 45, at 134-40, Tr. of Trial, 134:1-24, 135:2-25, 136:1-4, 137:4-25, 138:1-25, 139:1-25, 140:1-25, April 12, 2021).

60. The May 2018 contract did not include work in the crawlspace in the existing portion of the property, nor did it include sump pumps or a dehumidifier. (Doc. 45, at 90, Tr. of Trial, 90:3-20, April 12, 2021; Plaintiff Ex. 1; Defendants Ex. 81).

61. Sands alleged that the floors were cupped or warped, however in the photographs taken in August 2019, there was no warping. Kambouris explained that if the floors were warped before, they would not have returned to normal. (Doc. 46, at 51, 52, Tr. of Trial, 51:7-21, 52:1-5, April 20, 2021; Defendants Ex. 98-100).

62. The May 2018 contract did not include a water softening kit. (Doc. 45, at 183-84, Tr. of Trial, 183:19-25, 184:1-8 April 12, 2021; Plaintiff Ex. 1; Defendants Ex. 81).

63. The May 2018 contract did not include the cost of granite. (Plaintiff Ex. 1; Defendants Ex. 81).

64. The parties agreed to minimal cleaning, but in-depth cleaning was not included in the contract. (Doc. 46, at 177, Tr. of Trial, 177:13-25, April 12, 2021; Plaintiff Ex. 1; Defendants Ex. 81).

65. The May 2018 contract did not include costs for re-keying the house and Kambouris did not do so. (Doc. 45, at 89, 185, Tr. of Trial, 89:7, 185:13-17, April 12, 2021; Plaintiff Ex. 1; Defendants Ex. 81).

66. Kambouris did not install the doorknobs. (Doc. 45, at 173, Tr. of Trial, 173:3-4, April 12, 2021).

67. Sands paid for the front door himself which cost $3,502.35. (Doc. 45, at 31-32, 218, Tr. of Trial, 31: 4-25, 32:1-5, 218:13-17, April 12, 2021).

68. Kambouris did not provide or install the shower doors. (Doc. 45, at 32-33, 216-17, Tr. of Trial, 32:6-25, 33:1-4, 216:25, 217:1-11, April 12, 2021).

69. The work that Kambouris completed was done in a professional and workmanlike manner. (Doc. 45, at 127, 128, Tr. of Trial, 127:7-25, 128:1-5 April 12, 2021; Defendants Ex. 36, 86).

## CONCLUSIONS OF LAW

The Court has jurisdiction over the instant action under 28 U.S.C. § 1332. The Court has diversity jurisdiction over this action as Plaintiff is a citizen of the State of Florida, Defendants are citizens of the Commonwealth of Pennsylvania, and the amount in controversy exceeds $75,000. (Doc. 1, at 2); 28 U.S.C. § 1332(a)(1). Venue is proper in this Court as this suit has been brought in the district where Defendant resides, where a substantial part of the acts giving rise to the claims occurred, and where a substantial part of the Property that is the subject of the action is situated. 28 U.S.C. §§ 1391(b)(1), 1391(b)(2).

To reiterate, Sands argues that Kambouris breached a home improvement contract between the parties when he failed to adhere to the agreed upon terms of the contract by not completing the work on the Property and not conducting the work in a workmanlike manner. Additionally, Sands contends that Kambouris has been unjustly enriched and has violated the HICPA and the UTPCPL. Kambouris states that Sands breached the home improvement contract between the parties when he failed to pay Kambouris the total amount agreed upon

in the contract plus the additional amount owed to Kambouris in compensation for the additional services that were requested throughout the time of construction. Additionally, Kambouris claims that Sands has been unjustly enriched as Sands has accepted $203,329.00 in goods and services provided by Kambouris and has only paid Kambouris $172,000.00 in compensation for those goods and services. Plaintiff is seeking a total of $135,934.92 for breach of contract and treble damages and $22,972.00 in attorneys' fees for a total of $204,218.36 in damages. Defendants are seeking $24,800.00 plus costs for unjust enrichment.

## I. BREACH OF CONTRACT

1. A claim for breach of contract under Pennsylvania law requires: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 533 (M.D. Pa. 2021).

2. "In the process of interpreting a contract, the court seeks to ascertain the intent of the parties." *Williams v. Metzler,* 132 F.3d 937, 947 (3d Cir. 1997) (citing *Barco Urban Renewal Corp. v. Hous. Auth. Of City of Atlantic City,* 674 F.2d 1001, 1008 (3d Cir. 1982).

3. However, when interpreting a written contract the court focuses on "the intent embodied in the language that the parties chose to memorialize in their agreement." *Williams,* 132 F.3d at 947 (citing *Barco,* 674 F.2d at 1008-09).

4. "[U]nambiguous contracts are construed by courts as a matter of law." *Orion Drilling Co., LLC v. EQT Prod. Co.*, 826 F. App'x 204, 211 (3d Cir. 2020) (internal quotations omitted).

5. "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. . . . Whereas, when the words of

a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *Orion Drilling*, 826 F. App'x at 211 (internal citations and quotations omitted).

6. "Intent can be 'gleaned from the parties' ordinary course of dealing,' but 'naked assertions devoid of further factual enhancement fail to state an actionable claim.'" *Rutters*, 511 F. Supp. 3d at 533 (quoting *Longenecker-Wells v. Benecard Services Inc.*, 658 F. App'x 659, 662 (3d Cir. 2016)).

7. Courts must examine the writing as a whole. *Williams*, 132 F.3d at 947.

8. Bilateral contracts are "premised on reciprocal promises." *Giant Eagle, Inc. v. C.I.R.*, 822 F.3d 666, 673 (3d Cir. 2016).

9. Two written contracts exist between the parties: an unsigned contract from March 2018 and a signed contract from May 2018. ((Plaintiff Ex. 19, 1; Defendants Ex. 33, 81).

10. The March 2018 contract was not signed by Sands, but he agreed to the March 2018 contract's terms and provided consideration in the form of the additional payment required by the March 2018 contract. (Plaintiff Ex. 19; Defendants Ex. 33).

11. The May 2018 contract was signed by both parties. (Plaintiff Ex. 1; Defendants Ex. 81).

12. The signed contract dictates that Kambouris would perform contracting work for Sands and includes a total amount to be paid to Kambouris of $178,000.00. (Plaintiff Ex. 1; Defendants Ex. 81).

13. "[A] party breaches a bilateral contract when he does improperly or fails to do something which he has expressly or impliedly undertaken to do to facilitate the performance of the other party." *Johnson v. Fenestra, Inc.*, 305 F.2d 179, 181 (3d Cir. 1962).

14. Kambouris breached the May 2018 contract when he failed to complete the agreed upon tasks.

15. "[A] material breach of contract relieves the non-breaching party from any continuing duty of performance thereunder." *Milton Reg'l Sewer Auth. v. Travelers Cas. & Sur. Co. of Am.*, 648 F. App'x 215, 217 (3d Cir. 2016).

16. Sands materially breached the contract when he failed to tender full payment to Kambouris as was required under the May 2018 contract.

17. Because Sands failed to tender payment as agreed upon by the parties Kambouris was relieved of his duty to continue performance under the May 2018 contract.

18. In awarding compensatory damages for a breach of contract, the aim is to put the injured party in the position he would have been in had there been full performance of the contract through its duration. Restatement (First) of Contracts, § 329, cmt. a (1932).

19. An amount for "extras" was included in the May 2018 contract. The "extras" included toilets, faucets, shower fixtures, a hot water heater, vanity tops, faucets, sinks, shower valves, light outlets, switches, trim, doors, shower doors, paint inside, and only spot paint outside totaling an additional $15,957.00. (Plaintiff Ex. 1; Defendants Ex. 81).

20. When Kambouris left the project, the final plumbing items had not been selected and could not be included in the total for the May 2018 contract. The only plumbing that

was accounted for in the May 2018 contract was "rough-in plumbing" which includes installation of the pipes and drains and does not include actual toilets, faucets, etc. Thus, the total amount for the extras could not have included the amount for the actual toilets, faucets, etc. because the price of those items was unknown at the time the contract was written.(Doc. 45, at 173, 184, Tr. of Trial, 173:5-17, 184:9-16, April 12, 2021).

21. The March 2018 contract stated, "Kitchen Cabinets ?" with no price to the right. The May 2018 contract stated "Kitchen Cabinets ? $13,150." Notably the total price for the line items stayed at $162,043.00 between the March 2018 contract and the May 2018 contract. A line for "Kitchen Cabinets" was included in both contracts, however only one included a price. Kitchen cabinets were not included in the amount designated "extras." Thus, when interpreting the May 2018 contract the price for kitchen cabinets was not included in the total $178,000.00. Therefore, the outstanding balance owed to Kambouris for the kitchen cabinets is $13,150.00 bringing the total amount of work on the May 2018 contract to $191,150.00. (Plaintiff Ex. 19, 1; Defendants Ex. 33, 81).

22. The March 2018 contract and the May 2018 contract stated "Granite ? Included" with no price to the right. Granite was not included in the amount designated "extras." Thus, the price for granite was not included in the May 2018 contract. (Plaintiff Ex. 19, 1; Defendants Ex. 33, 81).

23. Sands testified that he purchased the front door at $3,502.35 and was directed by Kambouris to take it out of the balance of the contract. Thus, the price for the front door should be deducted from the amount owed under the May 2018 contract.

17

24. In both the March 2018 contract and the May 2018 contract the price of "Shower Doors" was $1,400.00. That price was included in both totals. Kambouris did not install the shower doors. Thus, the price listed in the May 2018 contract for shower doors should be deducted from the amount owed under the May 2018 contract. (Plaintiff Ex. 19, 1; Defendants Ex. 33, 81).

25. At the time Kambouris left the project the incomplete work consisted of the back of the bar counters, outlets, grout, painting of the outside of the house, interior locks, and the shower doors. (Doc. 45, 171-73, Tr. of Trial, 171:5-12, 172:7-15, 173:1-17, April 12, 2021).

26. As of the date of trial, Sands had paid $172,000.00 to Kambouris for the work Kambouris performed on the Property.

27. Under the written contract, Sands owed Kambouris $6,000.00 plus the amount for the kitchen cabinets $13,500.00, if Kambouris had completed all of the work for a total of 19,500.00.

28. Of the invoices Sands provided, he is entitled to $1,063.37 for the bathroom vanities; $3,502.35 for the front door; $1,643.00 for the doorknob installation, $657.37 for the outlets and switches; and $1,400.00 for the shower doors for a total of $8266.09.

29. Although Kambouris did not spot paint the outside of the house per the contract, it is unclear from the invoice from Ruth Painting how much Sands paid in painting what was required of the outside of the house. The Court cannot award speculative damages. *ATACS Corp. v. Trans World Comm., Inc.* 155 F.3d 659, 669 (3d Cir. 1998) (in assessing damages under Pennsylvania contract law "reasonable certainty embraces a

rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor.") (quoting *Spang & Co. v. U.S. Steel Corp.,* 545 A.2d 861, 866 (1988).

30. Kambouris failed to complete $8,266.09 of work and Sands failed to tender $19,150.00 to Kambouris in completion of the contract. Thus, Sands owes Kambouris a balance of $10,883.91.

31. Kambouris's breach of contract claims is **GRANTED**. Sands's breach of contract claim is **DENIED.**

## II. UNJUST ENRICHMENT

32. "Pennsylvania law supports two species of unjust enrichment claims [the first of which is] . . . a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim." *Mifflinburg Tele., Inc. v. Criswell,* 277 F. Supp. 3d 750, 801 (M.D. Pa. 2017).

33. "Unjust enrichment is an equitable doctrine." *McNeil v. Global Tel-Link,* No. 3:15-CV-01243, 2018 WL 6332847, at *4 (M.D. Pa. Nov. 9, 2018).

34. The elements for a claim for unjust enrichment under Pennsylvania law include: "(1) benefits conferred on defendant by plaintiff, (2) appreciation of such benefits by defendant, (3) and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *McNeil,* 2018 WL 6332847, at *4 (internal quotations and citations omitted).

35. "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *iRecycleNow.com v. Starr Indem.*

*& Liab. Co.*, 674 F. App'x 161, 163 (3d Cir. 2017) (internal citations and quotations omitted).

36. "[W]here . . . a valid and enforceable contract exists, a claim for unjust enrichment is generally precluded." *TriState HVAC Equip., LLP v. Big Belly Solar, Inc.,* 836 F. Supp. 2d 274, 288 (E.D. Pa. 2011).

37. "[T]he quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir. 1987).

38. In some instances courts "allow restitution as an alternative remedy for a breach of the contract, to prevent unjust enrichment." However, such a remedy is generally only available "where there is a claim for damages of total breach" – not partial breach. *TriState,* 836 F. Supp. 2d at 289.

39. Both parties brought claims for unjust enrichment and breach of contract. A written agreement exists between the parties. As such, both claims for unjust enrichment regarding the terms of the contract are **DENIED**.

40. "[A]n unjust enrichment claim may go forward if one party performs services wholly outside the scope of the contract." *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 687 (E.D. Pa. 2001) (citing *Hershey Foods*, 828 F.2d at 999); *see also Yourway Transp., Inc. v. Sunovian Pharm., Inc.*, No. 18-4363, 2019 WL 1574315, at *3 (E.D. Pa. Apr. 11, 2019).

41. "To dismiss an unjust enrichment claim, the Court must first find that the contracts entered by the parties at the beginning of the Project encompass the work that is the subject of the claim." *Yourway*, 2019 WL 1574315, at *3 (internal quotations and citations omitted).

42. Kambouris brings a claim for unjust enrichment for work that was done outside of the contract.

43. This work includes installing and trimming two windows in the laundry room and kitchen; installing and trimming three doors in the loft area; patching, painting, and performing electric work in the loft area; purchasing supplies for and building a closet in the garage; purchasing, installing and trimming two sliding exterior doors; purchasing and installing tile in an additional bathroom; and purchasing kitchen cabinets. Kambouris testified that the extra work performed cost a total of $24,800.00. (Defendants Ex. 99).

44. The kitchen cabinets were part of the contract and thus are not included in the amount for Kambouris's unjust enrichment claim. As such, $13,150.00 should be deducted from the total amount. (Plaintiff Ex. 1; Defendants Ex. 81).

45. The remaining items were not listed as items on the contract nor were they included in the amount designated for extras. (Plaintiff Ex. 1; Defendants Ex. 81).

46. Sands claims that Kambouris should have paid for loft work as he did not instruct Kambouris to conduct any work in the loft and that Kambouris's construction workers tore out the doors and carpeting by mistake. (Doc. 45, at 17-19, Tr. of Trial, 17:23-25, 18:1-8, 19:14-17, April 12, 2021).

47. Kambouris explains that the loft was in poor condition and that there was mold and staining through the carpet. Kambouris stated that Sands wanted work done to rectify the condition of the loft. (Doc. 45, at 48-49, Tr. of Trial, 48:24-25, 49:1-13, April 12, 2021, Defendants Ex. 11, 48-51).

48. The loft work was not included in the contract.

49. Sands claims that Kambouris cracked the sliding doors and was required to replace them. (Doc. 45, at 20, Tr. of Trial, 20: 16-25, April 12, 2021).

50. Kambouris testified that the sliding doors were rotted and stuck shut. Additionally, Kambouris explained that the sliding doors could not have been cracked due to the composition of the sliding doors' safety glass that shatters when it is hit. (Doc. 45, at 49-50, Tr. of Trial, 49:14-25, 50:1-7, April 12, 2021; Defendants Ex. 13-15).

51. The sliding doors were not included in the contract.

52. The contract did not include installing and trimming two windows in the laundry room and kitchen; installing and trimming three doors in the loft area; patching, painting, and performing electric work in the loft area; purchasing supplies for and building a closet in the garage; purchasing, installing and trimming two sliding exterior doors; and purchasing and installing tile in an additional bathroom. These items were outside of the scope of the contract.

53. Sands has been unjustly enriched in the amount of $11,650.00.

54. Kambouris's claim for unjust enrichment is **GRANTED**.

III.    **PENNSYLVANIA HOME IMPROVEMENT CONSUMER PROTECTION ACT, 73 P.S. § 517.1**

55. Section 517.9 of the Pennsylvania Home Improvement Consumer Protection Act states that :

> No person shall:
>
> . . .
>
> (5) Abandon or fail to perform, without justification, any home improvement contract or project engaged in or undertaken by a contractor. For the purposes of this paragraph, the term "justification" shall include nonpayment by, the owner as required under the contract or any other violation of the contract by the owner.

(6) Deviate from or disregard plans of specifications, in any material respect, without a written change order dated and signed by both the contractor and owner, which contains the accompanying price changes for each deviation.

56. Kambouris is a contractor as defined by 73 P.S. § 517.2.

57. The contract is a home improvement contract as defined by 73 P.S. § 517.2.

58. As stated supra, the May 2018 contract was a valid and binding contract that was signed by both parties, presented the tasks and costs for the project, and payment was tendered in part by Sands. (Plaintiff Ex. 1; Defendants Ex. 81); *see Bell v. Able & Sullivan, LLC*, No. 16-1851, 2016 WL 4771857, at *4 (E.D. Pa. Sept. 13, 2016) (the court looked to "(1) whether both parties manifest an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration" when assessing if a contract was alleged to exist under HICPA) (quoting *ATACS Corp.,* 155 F.3d at 666); Cf. *Hoover Contracting Co., Inc. v. McNaughton*, 242 A.3d 429, 430 (Super. Ct. Pa Nov. 18, 2020) (finding that a contract did not exist under HICPA when  the parties never obtained a signed writing with all of the terms mandated by HICPA).

59. Kambouris abandoned the home improvement project and failed to perform the entirety of the work required by the home improvement contract.

60. "'[J]ustification' shall include nonpayment by, the owner as required under the contract or any other violation of the contract by the owner." 73 P.S. § 517.9(5).

61. Sands failed to pay Kambouris for the work as was required under the contract.

62. As such, Kambouris was justified in abandoning the home improvement project and did not violate section 73 P.S. § 517.9(5) of the HICPA.

23

63. Additionally, Kambouris did not deviate or disregard plans from the contract and did not violate section 73 P.S. § 517.9(6) of the HICPA.

64. Sands's claim under the HICPA is **DENIED**.

## IV. PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. 201-1

65. "A violation of any of the provisions in [HICPA] shall be deemed a violation of the . . . Unfair Trade Practices and Consumer Protection Law ("UTPCPL")" 73 P.S. § 517.10.

66. "HICPA's homeowner remedy for violations of the Act by Contractors is [the UTPCPL], which authorizes a 'private action to recover actual damages' to any person who 'suffers any ascertainable loss of money or property . . . as a result of' the violation." *Hoover*, 242 A.3d at 430 (citing 73 P.S. § 201-9.2).

67. Section 201-2 of the Pennsylvania Unfair Practices and Consumer Protection Law states that:

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> . . .
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
>
> (xvi) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing.

24

68. Treble damages are awarded at a court's discretion and "provide such additional relief as [the Court] deems necessary or proper." 73 P.S. § 201-9.2(a); *see also Lindsley v. Am. Honda Motor Co., Inc.*, No. 16-941, 2017 WL 2930962, at *10 (E.D. Pa. July 7, 2017).

69. "In determining whether to award treble damages, 'courts of original jurisdiction should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL.'" *Gadley v. Ellis*, No. 3:13-17, 2016 WL 1090654, at *3 (W.D. Pa. Mar. 18, 2016) (quoting *Schwartz v. Rockey* , 932 A.2d 885, 898 (Pa. 2007)).

70. Because Kambouris was justified in abandoning the home improvement project and did not deviate from the plans, Sands is not entitled to compensatory damages under the UTPCPL. *See supra.*

71. Kambouris did not act in an intentional or reckless manner in the work he performed or in abandoning the project. Thus, Sands is not entitled to treble damages or attorney's fees.

72. Sands's claim under the UTPCPL is **DENIED**.

## CONCLUSION

For the foregoing reasons, this Court concludes that Sands breached the May 2018 contract with respect to payment obligations and Kambouris's was relieved of his duty to continue performance under the May 2018 contract. Furthermore, the Court concludes that Sands was unjustly enriched by work that was done outside of the May 2018 contract. Finally, the Court concludes that Kambouris's abandonment of the project was justified and the work that was completed was done in compliance with the parties' agreement and thus was not a violation of the HICPA or the UTPCPL. Accordingly, Defendants are entitled to judgment in their favor on its claims for breach of contract and unjust enrichment in the amount of **$22,533.91**. The Clerk of Court is directed to close this matter.

An appropriate Order shall follow.

**BY THE COURT:**

Dated: **December 31, 2021**                    *s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**Chief United States Magistrate Judge**